296 P.3d 74

NUCOR CORPORATION, Plaintiff/Appellant/Cross–Appellee,

v.

EMPLOYERS INSURANCE COMPANY OF WAUSAU, Defendant/Appellee/ Cross–Appellant,

and

Hartford Accident and Indemnity Company, Defendant/Appellant/ Cross–Appellee.

Nucor Corporation, Plaintiff/Appellant,

v.

Employers Insurance Company Of Wausau, Defendant/Appellee.

Nos. 1 CA–CV 10–0174, 1 CA–CV 10–0454.

Court of Appeals of Arizona, Division 1, Department E.

Nov. 23, 2012.

Review Denied Apr. 23, 2013.

---

* Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Samuel A. Thumma, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

Winston & Strawn, LLP by Scott P. DeVries, Pro Hac Vice, Yelitza V. Dunham, Pro Hac Vice, San Francisco, and Fennemore Craig, P.C. by Timothy Berg Christopher L. Callahan, Theresa Dwyer–Federhar, Phoenix, Attorneys for Plaintiff/Appellant/Cross–Appellee Nucor Corporation.

Barber Law Group by Bryan M. Barber, Pro Hac Vice, San Francisco, and Ryley Carlock & Applewhite PA by John C. Lemaster, Phoenix, Attorneys for Defendant/Appellee/Cross–Appellant Employers Insurance Company of Wausau,

Gordon & Rees LLP by David C. Capell, Pro Hac Vice, San Francisco, and Bowman and Brook LLP by Thomas M. Klein, Phoenix, Attorneys for Defendant/Appellant/Cross–Appellee Hartford Accident and Indemnity Company.

## OPINION

PORTLEY, Judge.

¶ 1 Nucor Corporation ("Nucor"), Hartford Accident and Indemnity Company ("Hartford"), and the Employers Insurance Company of Wausau ("Wausau") challenge rulings the trial court made in resolving indemnity and defense costs claims. As we explain, we affirm in part, reverse in part and remand for further proceedings.[1]

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 The City of Phoenix detected trichloroethylene ("TCE")[2] in its water wells in July 1982. The Arizona Department of Environmental Quality ("ADEQ") began an investigation into the source and extent of the contamination and determined that Nucor had contributed to the contamination because it owned an electronics manufacturing plant that had used TCE as a cleaning solvent. ADEQ sent Nucor a letter in 1989 identifying it as a potentially responsible party ("PRP") and directing it to take remedial action. Nucor subsequently settled the ADEQ claim for $1,275,000.[3]

¶ 3 Before the settlement was approved, Nucor and others were sued in *Baker v.*

*Motorola* ("*Baker*"), Maricopa Cnty.Super. Ct. Cause No. CV 1992–002603. A year later, they were sued in *Lofgren v. Motorola* ("*Lofgren*"), Maricopa Cnty.Super. Ct. Cause No. CV 1993–005322. The class action lawsuits were consolidated, which resulted in three classes of plaintiffs: (1) those who sought expenses for future medical monitoring because of TCE exposure ("medical monitoring claims"); (2) those who sought damages for the diminution in the value of their property because of the stigma of being located above groundwater containing TCE ("stigma claims"); and (3) those who suffered personal injuries or death allegedly caused by the contamination. Nucor subsequently settled the class claims for more than $21 million.

¶ 4 During the class action litigation, Nucor sued Hartford and another insurer in May 1997, for declaratory relief, breach of contract, and breach of the covenant of good faith and fair dealing. Nucor subsequently amended the complaint to add additional claims and to add Wausau, American Mutual, Travelers, and various excess carriers as defendants. The trial court granted partial summary judgment to Travelers and Wausau in 2004 after finding that their insurance policies did not cover the settlement of the "stigma claims" because the groundwater contamination had not damaged any property or interfered with the use of any property.

¶ 5 Nucor subsequently filed motions for summary judgment against its carriers. Hartford, Travelers, Twin City Fire Insurance Company, and First State Insurance Company settled with Nucor; Travelers also assigned its contribution rights to Nucor, and Nucor agreed to defend Hartford on the released policies and claims, including those by other insurers. The court subsequently found that Wausau had breached its duty to defend Nucor on the ADEQ claim and grant-

---

1. We resolve the remaining issues on appeal in a memorandum decision pursuant to Arizona Rule of Civil Appellate Procedure 28(g).

2. TCE is a volatile organic compound and an industrial solvent.

3. ADEQ filed a lawsuit in federal district court to confirm the settlement pursuant to the Comprehensive Environmental Response, Compensation,

and Liability Act ("CERCLA"), 42 U.S.C. § 9607 (2006). *State of Ariz. ex rel. Woods v. Nucor Corp.*, 825 F.Supp. 1452, 1455 (D.Ariz.1992). The court entered the stipulated judgment pursuant to the agreement. *Id.* at 1455. Although challenged by nonparties, the settlement was affirmed by the Ninth Circuit. *State of Ariz. v. Components Inc.*, 66 F.3d 213 (9th Cir.1995).

ed Nucor partial summary judgment. Wausau then filed a cross-complaint against Hartford and Travelers for declaratory relief, equitable indemnity and equitable contribution claims. Nucor unsuccessfully sought to be substituted as the indemnitor for Hartford and Travelers, but was allowed to intervene in the cross-claim.

¶ 6 The trial court then divided the remaining issues into four trial phases.[4] Phase II focused on the percentage of defense costs owed by the primary insurers. After a bench trial, the court concluded that Travelers and Hartford had to reimburse Wausau for prejudgment interest to the extent that they had not paid their fair share of Nucor's defense costs. Additionally, the court set the percentage that each insurer would have to equitably contribute to pay Nucor's reasonable and necessary defense costs. Nucor, Hartford, Twin City, and First State subsequently filed their appeals after the court entered its final amended judgment incorporating rulings from the first three phases in January 2010 pursuant to Arizona Rule of Civil Procedure ("Rule") 54(b).

## DISCUSSION

### I

¶ 7 Nucor and Wausau challenge different summary judgment rulings. Nucor argues that the court erred by ruling that Wausau's policies do not cover the portion of the *Baker* settlement paid to settle the stigma claims. Wausau contends the court erred by ruling that it had a duty to defend Nucor in the ADEQ proceeding.

¶ 8 Mindful of the requirements of Rule 56, we review the grant of summary judgment de novo. *Hamill v. Mid–Century Ins. Co. of Ariz.*, 225 Ariz. 386, 387, ¶ 5, 238 P.3d 654, 655 (App.2010). We also review statutory interpretations and the application and validity of exclusions in insurance policies de novo. *See Farmers Ins. Co. v. Young*, 195 Ariz. 22, 24, ¶ 5, 985 P.2d 507, 509 (App.1998).

¶ 9 When interpreting insurance policies, we apply the language according to its plain

and ordinary meaning from the standpoint of an individual untrained in law or business. *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 200, ¶ 14, 236 P.3d 421, 427 (App.2010). If the policy is ambiguous because it is susceptible to "conflicting reasonable expectations," we then consider "legislative goals, social policy, and examin[e] the transaction as a whole, including the reasonable expectations of the insured." *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 258, 782 P.2d 727, 734 (1989); *Desert Mountain*, 225 Ariz. at 200, ¶ 14, 236 P.3d at 427.

### A

¶ 10 Nucor contends that the trial court erred by determining that the portion of the settlement attributed to the stigma claims is not covered by the subject insurance policies. We have to determine whether the portion of the settlement attributed to the stigma claims is covered under the policies.

¶ 11 To answer the question we must turn to the language of the policies and the nature of the claims being made and the damages sought. *State Farm Mut. Auto. Ins. Co. v. Connolly ex rel. Connolly*, 212 Ariz. 417, 419, ¶ 9, 132 P.3d 1197, 1199 (App. 2006). We also look at the underlying action to determine if coverage exists. *Auto–Owners Ins. Co. v. Carl Brazell Builders, Inc.*, 356 S.C. 156, 588 S.E.2d 112, 115 (2003); *see Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1099 (1st Cir.1989) (when the underlying litigation is settled prior to trial, "the duty to indemnify must be determined in the basis of the settlement"). We know that an insured cannot pursue insurance indemnification for a claim that was dismissed. *See Great Am. Lloyds Ins. Co. v. Mittlestadt*, 109 S.W.3d 784, 786 (Tex.Ct.App. 2003) ("Unlike the duty to defend, ... the duty to indemnify arises from proven, adjudicated facts."). Moreover, in other contexts we have held that there is no coverage for economic loss claims in the absence of physical damage to property. *See McCollum v.*

---

4. We only discuss the trial phases relevant to this opinion. The other three phases are discussed in the accompanying memorandum decision.

*Ins. Co. of N. Am.*, 132 Ariz. 129, 130–31, 644 P.2d 283, 284–85 (App.1982) (discussing the same policy language requiring "injury to or destruction of tangible property" and holding there must be actual physical damage to the land; therefore, no recovery was available for land's failure to appreciate due to the failure to make the agreed improvements); *Travelers Indem. Co. v. State*, 140 Ariz. 194, 196–97, 680 P.2d 1255, 1257–58 (App.1984) (holding that in the absence of direct physical injury to the investors' tangible property, investors' claims for purely economic harm are not covered).[5]

¶ 12 The policies obligate Wausau to indemnify Nucor for "all sums [Nucor] shall become legally obligated to pay as damages because of property damage." The policies define "property damage" as:

 (1) [P]hysical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

 (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

¶ 13 In making its ruling, the trial court knew that the *Baker* class action property damage claims had been dismissed by summary judgment. As a result, the court found that "[t]he home-owner[s]/plaintiffs in the underlying action were not compensated in the settlement for physical injury to tangible property (groundwater) or their right to use the groundwater but were paid for intangible property loss[,] that is, diminution in the value of their real property." Nucor, however, contends that the policies do not require the property to be damaged; but only that if

there was a claim for property damage, any resulting damages are covered by the policies.

¶ 14 Nucor argues that other courts have allowed recovery under an insurance policy when the plaintiff in the underlying action sought purely economic damages that arose out of property damage to a third party. For example, in *DiMambro–Northend Associates v. United Construction, Inc.*, the plaintiff was precluded from performing its contract to construct a portion of a tunnel when another contractor negligently caused a fire in the tunnel. 154 Mich.App. 306, 397 N.W.2d 547, 548 (1986). Although the plaintiff's property was not damaged, it was prevented from timely completing its portion of the construction project. *Id.* It sued the negligent contractor for economic damages, including lost profits and increased labor costs. *Id.* Despite the trial court's finding that the requested damages were only economic damages, *id.* at 550, the appellate court reversed and stated that "we refuse to read into the plain language of the policy a requirement or condition that the tangible property, damaged by the occurrence, belong to the [plaintiff]." *Id.* at 551; *see Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 830 (7th Cir.1992) ("[The policy] does not state that it applies only to damage to property owned by the plaintiff in the underlying action.").[6]

¶ 15 The California Supreme Court reached a similar conclusion in *AIU Insurance Co. v. Superior Court*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990). There, a company with multiple insurance policies was sued for injunctive relief and reimbursement for costs incurred pursuant to CERCLA. *Id.* at 1258–60. In resolving

---

5. *But see Selective Res. v. Superior Court*, 145 Ariz. 151, 152–54, 700 P.2d 849, 850–52 (App. 1984) (holding in an eminent domain case that evidence of the adverse biological effects from electromagnetic field exposure was "highly relevant" to devaluation of the landowner's remaining property).

6. Nucor relies upon a host of other cases that we find inapplicable. Those cases involve plaintiffs who alleged property damage accompanied by consequential damages. For example, *DeWitt Construction Inc. v. Charter Oak Fire Insurance*

*Co.* dealt with coverage for a subcontractor's work and underground mechanical piping damaged by the insured's installation of defective cement piles. 307 F.3d 1127, 1132–36 (9th Cir. 2002). In *Aetna Casualty and Surety Co. v. PPG Industries, Inc.*, the claimant's buildings were damaged by defective or hazardous insulation. 554 F.Supp. 290, 293 (D.Ariz.1983). In another, the claimant's home was damaged by mold. *Liristis v. Am. Family Mut. Ins. Co.*, 204 Ariz. 140, 143, ¶ 12, 61 P.3d 22, 25 (App.2002).

whether the insurance policies covered the environmental cleanup costs as "property damage," *id.* at 1279–80, the court noted that the government or its agencies did not have a "compensable proprietary interest in the property," *id.* at 1261, 1279, and then stated:

> We also hold that reimbursement of response costs and the costs of injunctive relief under CERCLA and related statutes are incurred "because of" property damage. [T]he mere fact that the governments may seek reimbursement of response costs or injunctive relief without themselves having suffered any tangible harm to a proprietary interest does not exclude the recovery of cleanup costs from coverage under the "damages" provision of CGL policies. The Court of Appeal's emphasis on the fact that the agencies' objectives may be regulatory rather than proprietary is misplaced. Whatever their dominant motive, the event precipitating their legal action is contamination of property. The costs that result from such action are therefore incurred "because of" property damage.

*Id.* at 1279.

¶ 16 Wausau, however, notes that other courts have required actual damage to the property to trigger insurance coverage for "damages because of" property damage.[7] For example, the Fourth Circuit, applying South Carolina law, interpreted a similar policy requiring insurance coverage for "damages because. of property damage" when a service station gasoline leak migrated onto the property of the adjoining landowner. *Spartan Petroleum Co. v. Federated Mut. Ins. Co.*, 162 F.3d 805, 809 (4th Cir.1998). The court noted that the insurer "shall have the right and duty to defend any suit against the insured seeking damages on account of

*such* ... property damage." *Id.* The court then held that " '[s]uch' refers to the property damage that is the subject of the underlying suit. 'Property damage' therefore means 'damage to the property of the underlying claimant.' " *Id.*

¶ 17 We do not need to resolve whether actual damage to an insured's property is necessary to trigger coverage because we find that the portion of the settlement to the *Baker* plaintiffs for their stigma claims is too unrelated to property damage to require indemnity under Wausau's policies. *See Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn.1985) (holding that interest expenses and lost profits were "simply too tenuously related to [the ...] lost use of the [property] to be recoverable as consequential damages"). The genesis of the *Baker* negligence claim was not that the property was actually physically damaged, causing reduced property values. Instead, the *Baker* plaintiffs, who included people who did not own property or live above any contamination, believed that their property values may be diminished in the future because they may have difficulty in selling their homes due to the existence of the contamination plume.

¶ 18 We find support for our interpretation in *Adams v. Star Enterprise*, 51 F.3d 417 (4th Cir.1995). After a nearby oil spill, landowners sued for property damage even though their property had not been contaminated by the underground plume. *Id.* at 421. They, however, sought damages for the diminution in the value of their property due to their proximity to the plume. *Id.* The Fourth Circuit affirmed the dismissal of the diminution claim under Virginia law because the complaint only sought economic damages without any direct physical impact. *Id.* at

---

7. Wausau cites a number of cases holding that diminution in value without actual property damage is not a compensable claim. The cases, however, are distinguishable on various grounds. *See Goodstein v. Cont'l Cas. Co.*, 509 F.3d 1042, 1052–54 (9th Cir.2007) (addressing damage to the insured's property, not a third party); *Block v. Golden Eagle Ins. Corp.*, 121 Cal.App.4th 186, 17 Cal.Rptr.3d 13, 26 n. 14 (2004) (addressing damage to the insured's property and stating "[w]e do not decide whether the various policies at issue here would provide coverage for claims

that, ... caused damage to third parties"); *Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 487 N.W.2d 715, 717–28 (1992) (addressing a lawsuit for a diminution in value claim and not a subsequent insurance claim); *Auto–Owners*, 588 S.E.2d at 112–16 (addressing property damage that occurred before the insurance policy was purchased); *cf. State Farm Fire & Cas. Co. v. Tillerson*, 334 Ill.App.3d 404, 268 Ill.Dec. 63, 777 N.E.2d 986, 991–92 (2002) (addressing an insured contractor's underlying liability for defective work which caused diminution in value).

424–25. The court noted that "[t]he 'stigma' caused by the oil spill has reduced the value of Landowners' homes because of 'fear in the minds of the buying public' In essence, Landowners argue that [the defendant's] negligence has interfered with their ability to contract with third parties for the sale of their homes...." *Id.* at 424. The court concluded that the landowners cannot proceed without "demonstrating an actual physical encroachment on their properties." *Id.* at 425.

¶ 19 As in *Adams*, the groundwater contamination was the precipitating event in this case, but there was no damage to the properties of the *Baker* plaintiffs. Nucor settled to assuage the fears of the property owners that their property might be devalued if the buying public knew of the underground plume of groundwater contamination. As a result, the portion of the settlement attributed to the stigma claim was too attenuated to constitute "damages because of property damage" as envisioned in the insurance agreement. Accordingly, we affirm the judgment that the policies do not cover any future diminution-in-value claims by the *Baker* plaintiffs.[8]

**B**

¶ 20 Wausau challenges the summary judgment ruling that it had a duty to defend Nucor in the ADEQ proceeding. We examine whether the policies covered the ADEQ action, and we review the interpretation of the insurance contracts de novo. *Connolly*, 212 Ariz. at 418, ¶ 4, 132 P.3d at 1198.

¶ 21 After Nucor received its PRP letter, it tendered its defense to Wausau. Wausau refused to defend Nucor because its policies only covered "suits" which did not include the ADEQ administrative enforcement action.

¶ 22 The Wausau CGL [9] policies provided that:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage

to which this insurance applies ... and the company shall have the right and duty to defend any suit against the insured seeking damages ... and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

¶ 23 Despite Wausau's argument, the trial court found that Wausau should have provided Nucor with a defense. The court ruled the ADEQ action was covered by the policies because, with one exception, the policies did not define the term "suit," [10] and the ADEQ matter was adversarial and involved "the application of facts to legal requirements to solve a problem."

¶ 24 Courts addressing the scope of a "suit" as set forth in insurance policies have reached conflicting results. Some find that the term "suit" is unambiguous and requires a court action. *Lapham–Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842, 846–48 (1995); *Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp.*, 968 F.2d 707, 713–14 (8th Cir.1992); *Harleysville Mut. Ins. Co. v. Sussex County*, 831 F.Supp. 1111, 1131–32 (D.Del.1993); *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16, 20 (Me.1990); *Foster–Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, 275 (1998).[11] These decisions find support in dic-

8. Because we affirm the ruling, we need not address any alternative argument.

9. Prior to 1986 "CGL" stood for "comprehensive general liability" but now stands for "commercial general liability." *Desert Mountain*, 225 Ariz. at 198 n. 2, ¶ 4, 236 P.3d at 426 (citations omitted).

10. Wausau's 1968 insurance policy with Nucor defined a "suit" as including "'an arbitration proceeding to which the insured is required to submit or to which the insured has submitted with the company's consent."

11. Although Wausau relies upon *Semple v. Tri–City Drywall, Inc.*, 172 Ariz. 608, 838 P.2d 1369 (App.1992), we think such reliance is misplaced. *Semple* construed the meaning of an "action" not

tionaries that define "suit" as "[a]ny proceeding by a party or parties against another in a court of law." Black's Law Dictionary 1475 (9th ed. 2009); *see* Webster's Ninth Collegiate Dictionary 1180 (1983) (defining suit as "an action or process in a court for the recovery of a right or claim"); Webster's II New Riverside University Dictionary 1159 (1994) (defining suit as "[a] court proceeding to recover a right or claim").

¶ 25 Other courts, however, have held that a PRP letter is considered a "suit" under CGL policies. *See, e.g., A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 628 (Iowa 1991); *Coakley v. Maine Bonding & Cas. Co.*, 136 N.H. 402, 618 A.2d 777, 786–87 (1992); *CD. Spangler Const. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133, 388 S.E.2d 557, 570 (1990); *Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1517 (9th Cir.1991); *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 407 Mass. 689, 555 N.E.2d 576, 580–81 (1990). Many of these courts find support in dictionaries that define a suit as "the attempt to gain an end by a legal process." *A.Y. McDonald Indus.*, 475 N.W.2d at 627 (quoting Webster's Third New International Dictionary 2286 (P. Gove ed. 1961)) (internal quotation marks omitted); *see also Coakley*, 618 A.2d at 786; *C.D. Spangler*, 388 S.E.2d at 570.

¶ 26 "Arizona follows the principle of construction that, where various jurisdictions reach different conclusions as to the meaning, intent, and effect of the language of an insurance contract, a strong indication of ambiguity is established." *Fire Ins. Exch. v. Berray*, 143 Ariz. 429, 432, 694 P.2d 259, 262 (App.1983); *see Wilson*, 162 Ariz. at 256, 782 P.2d at 732. Given the differing decisions, we turn to the goals, social policy, and the transaction as a whole to clarify the meaning of the contract in question.

¶ 27 The ADEQ letter was issued pursuant to Arizona Revised Statutes ("A.R.S.") section 49–287(E)(3) (West 2012).[12] Section 49–287(E)(3) authorizes ADEQ to issue orders to PRPs requiring "abatement of such release or threat of a release and appropriate remedial action." The orders are final and enforceable in superior court unless the recipient requests an administrative hearing. *See* A.R.S. § 49–287(F). Moreover, a PRP who fails to comply with an ADEQ order may be assessed a daily penalty of $5,000 in an action brought to enforce the order. A.R.S. § 49–287(I). And, in the absence of good cause, the failure to act may also subject the PRP to treble and punitive damages. A.R.S. § 49–287(J).

¶ 28 Here, the ADEQ letter identified Nucor as a PRP and directed it to prepare a Remedial Investigation/Feasibility Study, which required Nucor to: (1) collect historical information about the site; (2) evaluate the extent of the contamination; (3) prepare a remedial engineering analysis; (4) submit a Remedial Action Plan; and (5) implement the Remedial Action Plan. If Nucor disagreed, it was required to request an administrative hearing to avoid enforceability of the PRP letter in superior court. A.R.S. § 49–287(F). If Nucor failed to comply, it would face potentially large daily fines and the possibility of treble and punitive damages. A.R.S. § 49–287(H)–(J). And, any failure to comply could be considered when a court allocated liability among all PRPs. A.R.S. § 49–285(E)(3).

¶ 29 Wausau asserts that the ADEQ PRP letter was not a "suit," but at best a "claim." The distinction is difficult to discern in the context of a PRP letter. Ordinarily, a demand letter only informs the recipient of a threat of liability. The ADEQ letter, however, automatically imposed significant burdens

a "suit." *Id.* at 611, 838 P.2d at 1372. Moreover, it analyzed the term in the context of a statute, A.R.S. § 12–341.01(A), and relied upon "its usual legal sense." *Id.*

12. Absent material revisions relevant to this decision, we cite the current Westlaw version of applicable statutes. Title 49, Chapter 2, Article 5 is often referred to as the Water Quality Assurance Revolving Fund ("WQARF") Program. *See* Groundwater Cleanup Task Force, *Report to the*

*Arizona State Legislature of the Groundwater Cleanup Task Force* (1996), http://www.azwater. gov/AzDWR/PermitsFormsApplications/ documents/GWTaskForce.pdf. We cite the WQARF provisions in effect when ADEQ sent the PRP letter. Since 1990, there have been various amendments to the WQARF provisions, and the cited provisions may have been renumbered, appear in different paragraphs, or were substantially altered by subsequent legislation.

and potential liabilities on Nucor. As a result, a PRP letter is not simply a "claim" or a "garden variety demand letter." *Pintlar Corp.*, 948 F.2d at 1516; *Johnson Controls, Inc. v. Emp'rs Ins. of WAUSAU*, 264 Wis.2d 60, 665 N.W.2d 257, 284 (2003). It is, however, "analogous to a civil complaint" and "constitutes the functional equivalent of a suit and triggers the insurer's duty to defend." *Johnson Controls*, 665 N.W.2d at 284.

¶ 30 Moreover, any distinction between a suit and a claim is diminished in the context of CERCLA and WQARF.[13] Both CERCLA and WQARF are designed to encourage PRPs to avoid litigation. *Pintlar Corp.*, 948 F.2d at 1517 ("A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements."); *see* Groundwater Cleanup Task Force, *supra* ¶ 27 note 12. Those statutory provisions impose significant burdens and penalties on PRPs, which begin upon receipt of a PRP letter. The "unique, and uniquely harsh, consequence[ ]," is what has led many courts to conclude that "the letters are the functional equivalent of a suit." 2 Environmental Law Manual § 4.5.5.1.2, at 4.5–12 (Supp. 2002).

¶ 31 Moreover, there is nothing to suggest that the distinction between a suit and claim in the context of environmental remediation was ever discussed between the parties to the insurance contracts. The Kentucky Supreme Court, applying the reasonable expectations doctrine, held that an insurer could not avoid its duty to defend "by clinging to an archaic definition of 'suit.'" *Aetna Cas. & Surety Co. v. Commonwealth*, 179 S.W.3d 830, 837 (Ky.2005). The court further explained:

> [an] [i]nsured's receipt of a potentially responsible party (PRP) letter from the Environmental Protection Agency (EPA) or an equivalent state agency seeking remediation or remediation costs is a "suit" which a comprehensive general liability (CGL) insurer has a duty to defend.... [A] reasonable person in the position of the insured would expect the insurer to provide a defense.

*Id.* (quoting *Johnson Controls*, 665 N.W.2d at 285).

¶ 32 We agree with the Kentucky court's analysis. Moreover, we find further support for that analysis in recent amendments to the WQARF statute. Section 49–287(E)(4) provides that:

> Actions taken by the [ADEQ] director pursuant to sections 49–287.01 through 49–287.07 may substantially affect the rights and obligations of persons who may be liable under this article for the release or threatened release of a hazardous substance at a site or portion of a site for purposes of determining insurance coverage.[14]

Our legislature's belief that administrative actions taken by the ADEQ director are significant enough to affect "rights and obligations" for insurance purposes additionally supports a common sense conclusion that a PRP letter constitutes a "suit" for purposes of insurance coverage.

¶ 33 Wausau, however, contends that interpreting a "suit" to include a PRP letter will render the term "claim" superfluous, which is contrary to the principle that we endeavor to give meaning to every term in a contract. Courts applying the traditional approach have found the distinction important. Because many CGL polices provide that the insurer will defend *suits* but may investigate, negotiate, and settle *claims*, broadening the term "suit" to include PRP letters would render the distinction between claims and suits superfluous. *See Foster–Gardner*, 77 Cal.Rptr.2d 107, 959 P.2d at 274.

¶ 34 Other courts, however, have rejected the argument that construing "suit" to cover coercive administrative proceedings would make the term "claim" superfluous. The New Hampshire Supreme Court stated that it "cannot agree that the agency actions here are necessarily merely 'claims' and, thus, not subject to the defense requirement." *Coak-*

13. The WQARF provisions in effect in 1989 were modeled after CERCLA. Groundwater Cleanup Task Force, *supra* ¶ 27 note 12.

14. The quoted language was added by the Legislature in 1997. 1997 Ariz. Sess. Laws, ch. 295, § 33 (1st Reg. Sess.). By citing the statute, we do not decide whether the amendment was retroactive to this case.

*ley,* 618 A.2d at 786. Likewise, the Ninth Circuit has rejected such reasoning:

> The rationale behind defending insureds when a complaint has been filed is that, traditionally, that is when the jeopardy to the insureds' rights can be adversely affected. The focus should be on the underlying rationale and not on the formalistic rituals. If the threat is clear then coverage should be provided. The filing of an administrative claim is a clear signal that legal action is at hand.

*Pintlar,* 948 F.2d at 1517–18.

¶ 35 Moreover, if an insurer intends a narrow and technical definition of the term "suit," it is obliged to clearly define the term within its policies. *See Desert Mountain,* 225 Ariz. at 200, ¶ 16, 236 P.3d at 427 (citing *Pub. Serv. Co. of Colo. v. Wallis & Cos.,* 955 P.2d 564, 567 (Colo.Ct.App.1997) ("If the insurers had intended to provide coverage only when an enforcement action or lawsuit was brought, such a requirement could have been included in the policy language."), *rev'd on other grounds,* 986 P.2d 924 (Colo.1999)); *Commonwealth,* 179 S.W.3d at 839; *see generally Coconino County v. Fund Adm'rs Ass'n,* 149 Ariz. 427, 431, 719 P.2d 693, 697 (App.1986) ("If an insurer desires to limit its liability under a policy, it should employ language which clearly and distinctly communicates to the insured the nature of the limitation."). Wausau failed to define "suit" to exclude coercive administrative actions like the ADEQ proceeding. Accordingly, we agree with the trial court that receipt of the ADEQ letter triggered Wausau's duty to defend Nucor in the ADEQ proceeding.[15]

## II

¶ 36 We next address the Phase II bench trial issues: (1) whether Wausau, as the only insurance carrier to provide Nucor with a defense during the class action litigation, is entitled to equitable contribution; (2) whether Wausau should be bound by the interim defense agreement allocating a percentage share to it; and (3) whether Nucor is liable for the share of American Mutual, an insolvent insurer.

## A

¶ 37 Nucor challenges the ruling that Wausau was entitled to equitable contribution from other insurers for defense payments. The claim was based on "the equitable principle that where two companies insure the same risk and one is compelled to pay the loss, it is entitled to contribution from the other." *Indus. Indem. Co. v. Beeson,* 132 Ariz. 503, 506, 647 P.2d 634, 637 (App.1982) (internal quotation marks omitted); *see also Nat'l Indem. Co. v. St. Paul Ins. Cos.,* 150 Ariz. 458, 459, 724 P.2d 544, 545 (1986) (holding that an insurer must contribute to the defense costs borne by another insurer in defending their mutual insured); *see generally Home Indem. Co. v. Mead Reinsurance Corp.,* 166 Ariz. 59, 62, 800 P.2d 46, 49 (App.1990) ("Each insurer with a duty to defend, therefore, had to contribute to the indemnification of the insured."); *accord Ocean Accident & Guarantee Corp. v. U.S. Fid. & Guar. Co.,* 63 Ariz. 352, 357, 162 P.2d 609, 612 (1945). "The doctrine applies only when co-insurers have covered the same insured and the same particular risk at the same level of coverage." *U.S. Fid. & Guar. Co. v. Federated Rural Elect. Ins. Corp.,* 37 P.3d 828, 832, ¶ 13 (Okla.2001).[16]

¶ 38 Arizona courts apply a four-part test to determine whether an insurer will be required to contribute to another insurer's claim payment. The policies must cover "(1) the same parties, (2) in the same interest, (3) in the same property, [and] (4) against the

---

15. Nucor also argues that the "damages" provision in the CGL policy likewise encompasses costs the insured incurs even in the absence of suit. It relies in part upon *Desert Mountain,* 225 Ariz. at 200–01, ¶¶ 15–18, 236 P.3d at 427–28 (rejecting the narrow minority view that the term "legally obligated to pay as damages" extends only to amounts the court has ordered the insured to pay). We decline to address the issue because Nucor did not present it to the trial court. *See Stewart v. Mut. of Omaha Ins. Co.,* 169 Ariz. 99, 108, 817 P.2d 44, 53 (App.1991).

16. Equitable contribution differs from indemnification. Indemnification is "the shifting of 100 percent of the liability or payment obligation; contribution is the shifting of a proportionate share." 15 *Couch, infra* ¶ 38, § 217:1.

same casualty." *Granite State Ins. Co. v. Emp'rs Mut. Ins. Co.*, 125 Ariz. 275, 278, 609 P.2d 90, 93 (App.1980); *cf. W. Agric. Ins. Co. v. Indus. Indem. Ins. Co.*, 172 Ariz. 592, 594, 838 P.2d 1353, 1355 (App.1992) (holding that the lessee's insurer was not entitled to contribution from the lessor's insurer because the policies did not cover the same parties); *see generally* 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 218:3 (3d ed. 2011) [hereinafter *"Couch"*] (the policies must insure the same entities, the same interests in the same property, and the same risks). Wausau met the test, and we find no error by the trial court in finding that Wausau could pursue equitable contribution.

¶ 39 Nucor argues that there are other considerations that should preclude Wausau's claim. Citing *National Indemnity Co. v. St. Paul Insurance Cos.*, 150 Ariz. 458, 724 P.2d 544 (1986), Nucor maintains that Wausau had no right to contribution because, although it provided a defense for Nucor in its class action litigation, it did not pay indemnity costs prior to seeking contribution, and failed to voluntarily pay all defense costs for the ADEQ matter. Nucor's reliance is misplaced because *National Indemnity* does not require an indemnity payment as a prerequisite for seeking equitable contribution. *Id.* at 459, 724 P.2d at 545. There, the insurer who successfully sought contribution had discharged the duty to defend. *Id.* at 458–59, 724 P.2d at 544–45. Our supreme court did not limit the right of equitable contribution to those specific facts.

 ¶ 40 In fact, "[w]here multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured."

*Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 65 Cal.App.4th 1279, 77 Cal.Rptr.2d 296, 303 (1998). We see no reason to impose other conditions on the right to seek equitable contribution. So long as "one insurer pays a loss or defends a claim for which another insurer shares responsibility," equitable contribution is permitted. *Md. Cas. Co. v. Nationwide Ins. Co.*, 65 Cal.App.4th 21, 76 Cal. Rptr.2d 113, 116 (1998) (explaining that "[a]n insurer seeking equitable contribution need only demonstrate another insurer covered the same risk and failed to pay its share of the loss"); *Certain Underwriters at Lloyd's London & Excess Ins. Co. v. Mass. Bonding & Ins. Co.*, 235 Or.App. 99, 230 P.3d 103, 113 (2010) ("If plaintiffs and defendants had the same obligation to defend [the insured], and plaintiffs discharged a disproportionate share of that obligation, then the right to equitable contribution arose at that point in time."), *review denied*, 349 Or. 173, 243 P.3d 468 (2010).[17]

 ¶ 41 Nucor also asserts that Arizona law imposes a separate and independent duty on Wausau to first provide a complete defense before Wausau can seek contribution. We disagree. We find nothing in our jurisprudence that imposes that obligation before an insurer can seek contribution rights against other insurers. In fact, in *Centennial Ins. Co. v. United States Fire Ins. Co.*, the California Court of Appeals rejected a similar argument. 88 Cal.App.4th 105, 105 Cal. Rptr.2d 559 (2001). The court explained that:

> Centennial's argument confuses the rules applicable to equitable contribution *among insurers* with those pertinent to the relationship between an insurance carrier *and its own insured*.... An insurer's obligations to an insured are governed by the contract of insurance between the parties. In contrast, the reciprocal .contribution

---

**17.** The *Couch* treatise further refutes the argument that a failure to indemnify Nucor deprives Wausau of the right to pursue equitable contribution:

> The principle of contribution affects only the relationship of the co-obligors among themselves, and has no direct effect on the rights of a given insured. Equitable contribution also applies only between insurers, and only in the

absence of contract; hence, it also has no place between insurer and insured, which have contracted with each other. By the same token, an insurer's liability for contribution is not for the insured to disclaim, as it is founded on notions of equity and unjust enrichment, rather than on the concept of third-party beneficiary of contract.

15 *Couch, supra* ¶ 38, § 217:4.

rights and obligations of several insurers covering the same risk do not arise from and are not governed by contract; instead they "flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden." ... Although insurers must respond in full to a contractual policy holder's tender of defense, their respective obligations for contribution to other *insurers* for the costs of defense are entirely separate from their obligations to their insured and are adjusted equitably on the basis of all the circumstances of the case.

*Id.* at 565. Thus, Wausau is entitled to pursue separate rights of equitable contribution against the remaining insurers who insured the same risk.

¶ 42 Moreover, relying on *Continental Casualty Co. v. Zurich Insurance Co.*, Nucor maintains that an insurer who breaches its obligation should not be able "to profit, whether at the expense of the insured, or of an insurer which faithfully discharges its obligation." 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455, 462 (1961). The *Continental* admonishment is not applicable here because for years Wausau was the only carrier to defend Nucor at all. Consequently, an insurer seeking equitable contribution need only have paid more than its fair share and meet the *Granite State* requirements. 125 Ariz. at 278, 609 P.2d at 93; *see Nat'l Indem.*, 150 Ariz. at 459, 724 P.2d at 545; *Ocean Acc.*, 63 Ariz. at 357, 162 P.2d at 612; *see generally Couch, supra* ¶ 38, § 217:4 ("In the insurance context, the right to contribution among insurers arises" if "an insurer of a joint tortfeasor has paid all, or greater than its share of a loss....").

¶ 43 Nucor nevertheless complains that equitable contribution should not apply because the other insurers, excluding Wausau, have resolved their claims with Nucor. This argument misses the mark. Nucor's settlement with Hartford and Travelers did not serve to extinguish Wausau's contribution rights against these carriers. To create such a rule would allow one insurer to "settle for a limited amount" with the insured to avoid a contribution claim from an insurer who was not a party to such agreement and who paid

significant and disproportionate defense costs. *Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 139 (Utah 1997).

¶ 44 Nucor's argument also fails to acknowledge that all of its insurers refused to defend Nucor at some time. All refused to defend Nucor in the ADEQ proceeding, not just Wausau. Hartford had to be sued twice by Nucor for bad faith before it acknowledged coverage. Travelers did not defend Nucor in the class action litigation until Nucor sued it for bad faith. The purpose of the equitable contribution rule is "to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." *Fireman's Fund*, 77 Cal.Rptr.2d at 303–04. The trial court's decision furthered the purpose of the equitable contribution rule.

### B

¶ 45 We turn to the method the trial court used to allocate defense costs among insurers. Generally, the method of allocating defense costs among insurers is a matter of equitable judicial discretion. *Centennial Ins. Co.*, 105 Cal.Rptr.2d at 562. We review its decision for an abuse of discretion. *See id.* A court abuses its discretion when it commits an error of law in reaching a discretionary result. *Romer–Pollis v. Ada*, 223 Ariz. 300, 302, ¶ 12, 222 P.3d 916, 918 (App. 2009).

¶ 46 Relying upon *AMHS Insurance Co. v. Mutual Insurance Co. of Arizona*, the court ruled that each insurer's pro rata share of the liability will be determined by dividing its policy limits by the total amount of coverage. 258 F.3d 1090, 1102 (9th Cir.2001). The court then used a total coverage denominator of 23 years, based upon the 1961 to 1984 insurance period.

¶ 47 Nucor, however, contends that Wausau is bound by an interim-defense agreement to fund the *Baker/Lofgren* litigation, which would allot a higher percentage share to Wausau. Earlier in the litigation, however, Nucor successfully argued that the agreement was not binding. Nucor acknowledged that the parties had reserved their rights and

agreed to "fight another day over the given allocation percentages and reimbursement." Accordingly, the trial court correctly determined that the interim agreement was not binding, and it appropriately exercised discretion to choose the "policy limits" apportionment method requiring Hartford to contribute to Wausau. We find no abuse of discretion.

### C

¶ 48 Finally, Nucor challenges the trial court's decision to hold it responsible for a pro rata share of defense costs allocable to American Mutual, the insolvent primary insurer. The court assigned Nucor/American Mutual a 5% equitable contribution percentage. The court explained that:

It is not unfair to require NUCOR to assume a portion of its defense costs for the 14 months of failed coverage of the now insolvent American Mutual. This shifting of the costs of defense to an insured in place of an insolvent insurer is not unknown. *Security Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 826 A.2d 107 (2003). The primary carriers in this action contracted for the risks insured during definite policy periods and received premiums for those periods. It would be unfair at this time to require that they cover defense costs for which they received no premiums and not [sic] anticipated risks.

This sharing of costs of defense by the insured was also in place for a portion of this case. Mr. Baugh had earlier agreed that NUCOR would assume part of the defense costs on an interim basis in place of American Mutual.

¶ 49 In Arizona, "if any claim alleged in the complaint is within the policy's coverage, the insurer has a duty to defend the entire suit, because it is impossible to determine the basis upon which the [insurer] will recover (if any) until the action is completed." *W. Cas. & Sur. Co. v. Int'l Spas of Ariz., Inc.*, 130 Ariz. 76, 79, 634 P.2d 3, 6 (App.1981). In *Regal Homes, Inc. v. CNA Insurance*, the insured had three primary CGL "occurrence" policy insurers during the course of four years. 217 Ariz. 159, 169, ¶ 41,

171 P.3d 610, 620 (2007). Claims against the insured alleged various occurrences during the four-year period of coverage. *Id.* We held that although one of the insurers only provided coverage for one of the four years, it had a duty to defend the entirety of the underlying lawsuit. *Id.*

¶ 50 Like the insured in *Regal Homes*, Nucor had various CGL occurrence policies. The *Baker/Lofgren* plaintiffs alleged various occurrences spanning many years. During each of those years, Nucor was insured. Each of Nucor's insurers therefore would have been required to provide a complete defense for the claims filed against Nucor, including American Mutual if it was solvent. *See Regal Homes*, 217 Ariz. at 169, ¶ 41, 171 P.3d at 620.

¶ 51 The insurers, as we noted above, could recover defense costs from other insurers through the doctrine of equitable contribution. *See supra* ¶¶ 41–48; *Mut. Ins. Co. of Ariz. v. Am. Cas. Co. of Reading, Pa.*, 189 Ariz. 22, 26, 938 P.2d 71, 75 (App.1996); *Am. Cont'l Ins. Co. v. Am. Cas. Co. of Reading, Pa.*, 183 Ariz. 301, 303, 903 P.2d 609, 611 (App.1995). Although insurers have a right of equitable contribution among each other, that right does not usually extend to the insured. *See Buss v. Superior Court*, 16 Cal.4th 35, 65 Cal.Rptr.2d 366, 939 P.2d 766, 776 (1997). Unlike the relationship among multiple insurers, the insured and each insurer have an insurance contract that governs their relationship. Here, Wausau was contractually obligated to provide Nucor with a complete defense. If Wausau provided more coverage than bargained for under its insurance contract with Nucor, contractual remedies, not equitable contribution, were appropriate. *Id.*

¶ 52 The insured, however, may be required to cover a share of the defense costs for time periods in which it has foregone insurance coverage. *See Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 910 N.E.2d 290, 315 (2009) (citing S.M. Seaman & J.R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 4.3[c], at 4–21–4–28 (2d ed. 2008)); *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264

Conn. 688, 826 A.2d 107, 126 (2003) (allocating defense costs to the insured for periods when it was uninsured by choice, or had lost or destroyed the policies). Accordingly, when a policyholder "is self-insured for any period of time on the risk, many courts have concluded that it is equally fair and reasonable to hold the policyholder responsible for that portion of the total defense and indemnity costs over which he or she chose to assume the risk." *Towns v. N. Sec. Ins. Co.*, 184 Vt. 322, 964 A.2d 1150, 1167 (2008); *see also Boston Gas Co.*, 910 N.E.2d at 315. As explained by the Sixth Circuit, it is "reasonable to treat [the insured] as an insurer for those periods of time that it had no insurance coverage." *Ins. Co. of N. Am. v. Forty–Eight Insulations*, 633 F.2d 1212, 1225 (6th Cir.1980).

¶ 53 There is no equitable reason to treat Nucor as self-insured during the period of American Mutual's insolvency. Nucor did not assume the risk of loss during the relevant period and consequently, it would be inequitable to treat Nucor as self-insured for the American Mutual period when it had sought to limit its liability by purchasing insurance. *See TPLC, Inc. v. United Nat'l Ins. Co.*, 44 F.3d 1484, 1495 (10th Cir.1995) (holding that an insurer could not recover contribution from an insured with respect to injuries occurring both during the coverage period and thereafter).

¶ 54 Wausau nevertheless contends that Nucor had agreed in the 1992 defense cost-sharing agreement to pay a portion of the defense costs due to the insolvency of American Mutual. That agreement, however, was an interim one. Nucor's representative stated that Nucor was going to bear a share of defense costs only on an interim basis and reserved its rights relative to a later determination of ultimate responsibility.[18] Indeed, Wausau characterized the agreement as interim or temporary for purposes of its contribution claim. Wausau cannot now contend that the agreement is binding for purposes of shifting American Mutual's liability onto Nucor. Consequently, we reverse the order

requiring that Nucor pay 5% of its defense costs allocated to American Mutual and remand so the court can recalculate the equitable contribution judgment.

## CONCLUSION

¶ 55 Based on the foregoing and for the reasons set forth in the companion memorandum decision, we affirm the summary judgment rulings that the Wausau insurance policies did not cover the *Baker* negligence claims for stigma damages and the ADEQ PRP was a "suit" under the Wausau policies. We also affirm the court's ruling that Wausau was entitled to equitable contribution from the other primary insurers. We, however, reverse the order requiring Nucor pay 5% of its defense costs because American Mutual was insolvent and remand for reallocation of those costs to the other insurers consistent with this opinion.

CONCURRING: LAWRENCE F. WINTHROP, and ANN A. SCOTT TIMMER, Judges.

---

18. Because the insured in *Regal Homes* did not reserve its rights, we find that case distinguish-

able. 217 Ariz. at 159, 171 P.3d at 610.